# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,

    v.                                               Case No. 02-CR-74

PETER F. WAHLEN,

                Defendant.

---

## DECISION AND ORDER
### GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
### AS TO THE EXTENT OF THE GOVERNMENT'S FORFEITURE INTEREST IN THE BEAVER DAM AND DOOR COUNTY PROPERTIES
### AS TO PETER FRANCIS WAHLEN (DOC. # 50),
### GRANTING PLAINTIFF'S MOTION FOR EXTENSION OF TIME
### TO FILE REPLY BRIEF (DOC. # 60),
### GRANTING PLAINTIFF'S MOTION TO AMEND ORDER OF FORFEITURE TO INCLUDE DIRECTLY FORFEITABLE PROPERTY IN MARGARET WAHLEN'S MORGAN STANLEY ACCOUNT (DOC. # 66),
### GRANTING PLAINTIFF'S MOTION TO AMEND FINAL ORDER OF FORFEITURE TO INCLUDE CERTAIN SUBSTITUTE PROPERTY (DOC. # 69),
### GRANTING PLAINTIFF'S MOTIONS TO AMEND (DOCS. ## 74, 82), REQUIRING MARGARET WAHLEN TO PROVIDE AN ACCOUNTING REGARDING THE CASH-VALUE LIFE INSURANCE POLICIES, AND REQUIRING PLAINTIFF TO PREPARE DRAFT OF FINAL ORDER

After pleading guilty to two counts of bank fraud under 18 U.S.C. § 1344, defendant Peter Wahlen was sentenced to a total of 57 months imprisonment. The parties have since embarked on a "forfeiture/garnishment odyssey," filing briefs, supplemental briefs and supplements to their supplemental briefs over the span of more than two years. Initially, the government filed a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure regarding the forfeiture of two real properties. Soon thereafter, the government began filing multiple motions to amend the order of forfeiture, as well as applications for a writ of

garnishment. Peter and Margaret Wahlen were given additional time to conduct discovery and file responsive briefs, however, the subsequent briefing did not follow the federal and local rules. As a result, there are volumes of supporting evidence without proposed findings or responses. Nevertheless, the parties have stated on the record that they believe that this case is ready for disposition and that the issues can be decided on the documents before the court and proceedings to date. Consequently, the following decision supplements the oral findings made by this court during the July 14, 2005, motion hearing and discussion during the May 6, 2006, telephonic conference.

## Procedural History

The October 9, 2002, preliminary order of forfeiture imposed a money judgment of forfeiture in the amount of $1,167,932.86 and divested Wahlen of any right, title and interest in shares of Direct Gene Common stock, real property located at 814 Lakeshore Drive, Beaver Dam, Wisconsin, and real property located at 6482 Highway 57, Jacksonport, Wisconsin. (Doc. # 19) In addition, the October 9, 2002, restraining order prevented Wahlen and his agents from impairing or dissipating his interest in certain substitute assets. (Doc. # 20) On November 29, 2002, the court entered a written judgment incorporating the preliminary order of forfeiture. (Doc. # 31)

On November 13, 2002, and December 13, 2002, American National Bank (ANB) and Margaret Wahlen filed petitions asserting ownership interests in certain assets subject to the preliminary order of forfeiture, including Beaver Dam Property and Door County Property. (Docs. ## 25, 33) Over the course of the following year, the parties agreed to liquidate the following assets: Peter's Corvette ($23,000), Peter's Coin Collection ($4,806), the Beaver Dam property ($269,249.83), personal property contained in the Beaver Dam

-2-

property ($9,602.62), Hickory County Club stock ($600), and ANB stock ($26,500). The net proceeds were deposited in Attorney Raymond M. Dall'Osto's trust account, and the following distributions were made toward restitution: (1) February 14, 2003, payment of $12,903; and (2) February 25, 2004, payment of $305,352.45.

On June 11, 2003, the government filed proposed findings of fact and the court entered a briefing schedule. On February 24, 2004, the government filed its motion for partial summary judgment pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853 and Rule 56 of the Federal Rules of Civil Procedure. (Doc. # 50) The government argued that it was entitled to any monies invested in the Door County and Beaver Dam homes, along with any growth in those investments, off the top, prior to division of assets between Peter and Margaret Wahlen. While the government relied upon the forfeiture statutes and relation back doctrine, the bank asserted its claim under a constructive trust theory. (Doc. # 49) Margaret Wahlen responded that her property interests were not subject to forfeiture because she was an innocent spouse – not a criminal defendant. She further argued that an asset tracing analysis proffered by the government did not determine conclusively that tainted funds were used to purchase various properties. Finally, Margaret Wahlen argued that various retirement accounts were nonforfeitable due to ERISA's anti-alienation provision and the Wisconsin exemption law. (Doc. # 56)

Soon after the briefing was complete, the government moved to amend the order of forfeiture to include directly forfeitable property as well as the following substitute property of Peter Wahlen: $10,000 in funds held in the Morgan Stanley Investment Account No. 4411-015017 maintained in Margaret Wahlen's name, a portion of the $263,249.83 in net proceeds of the sale of the single-family residence at 814 Lakeshore Drive, Beaver Dam,

Dodge County, Wisconsin, a portion of the net equity of the sale of a single family home at 6482 Hwy 57, Sturgeon Bay, Door County, Wisconsin, that is not subject to direct forfeiture as proceeds of Peter Wahlen's bank fraud scheme, any portion of the funds in Morgan Stanley Investment Account No. 441-105017 held in Margaret Wahlen's name that is not subject to direct forfeiture as proceeds of Peter Wahlen's bank fraud scheme and not subject to garnishment, any portion of the funds in a Roth IRA at Morgan Stanley (Account No. 441-022504) held in the name of Margaret Wahlen that is not subject to garnishment, any portion of the funds in a Roth IRA at Edward D. Jones Co. Account No. 1549002317 held in the name of Margaret Wahlen that is not subject to garnishment, any portion of the funds in a Roth IRA held in U.S. Bank Account No. 600-0647-0700 held in the name of Peter Wahlen that is not subject to garnishment, any portion of the interest in an Employee Stock Ownership Plan (ESOP) established by ANB in the name of Peter Wahlen that is not subject to garnishment, proceeds of the sale of the Chevrolet Corvette automobile and a coin collection, proceeds of personal property sold at an auction on May 10, 2003, proceeds of the sale of 250 shares of Ambank Financial Services stock; and 19 shares of Valley Bancorporation. (Docs. ## 66, 69)

On May 12, 2004, the government filed a revised motion to amend the final order of forfeiture to include certain substitute property up to the amount of $961,688.12. In addition, the government referred to Account No. 1549002317 as an IRA at Edward D. Jones Co. rather than a Roth IRA, and the reference to the ESOP was been changed to the "funds in the IRA held at Morgan Stanley held in the name of Peter Wahlen (Peter's Roth IRA) that is not subject to garnishment in this matter." Further, on May 19, 2004, the government filed a second revised motion to amend the final order of forfeiture, which added the following language: "Any portion of the funds in the brokerage at American Funds (Account No.

56965461-01) held in the name of Margaret Wahlen that is not subject to garnishment in this matter" and "[t]he cash value of any Met Life life insurance and annuity policies held in the name of Peter Wahlen, including account numbers 667 203 748 A, 687 201 479 A, 740 592 676 A, 886 431 090 UM, 896 130 118 UL, and 618 209 045 to the extent the cash value is not subject to garnishment." (Docs. ## 74, 82)

During this period, the government filed applications for garnishment against the following properties: the Employee Stock Ownership Plan established by Peter Wahlen, a Morgan Stanley investment account held in the name of Margaret Wahlen (No. 441-015017), a Morgan Stanley Roth IRA (No. 441-022504), a US Bank IRA (No. 600-0647-0700) held in the name of Peter Wahlen, an Edward D. Jones IRA investment account held in the name of Margaret Wahlen (No. 1549002317), an American Mutual Funds IRA held in the name of Margaret Wahlen, and six Metlife Insurance Policies. (Docs. ## 62, 63, 70, 72, 73, 76, and 77) Margaret Wahlen objected to the garnishment actions and requested that the named garnishees wait for a court determination of her interest in the property.

### Plaintiff's Motion for Partial Summary Judgment

The government's motion for partial summary judgment asks the court to determine the criminal proceeds traceable to the Door County and Beaver Dam properties. The government argues summary judgment is appropriate because Margaret Wahlen cannot create a genuine issue of material fact regarding the government's tracing analysis. In the alternative, the government maintains that any disposition "would be useful in view of the parties' current litigation positions for the court to simply find that a significant portion of the real properties' net equity is attributable to criminal proceeds."

-5-

Specifically, the government asks the court to rule that at least $93,882 in criminal proceeds were used to acquire or maintain the Beaver Dam property and that at least $102,362.74 in criminal proceeds were used to purchase, improve and make loan payments on the Door County property. Because funds in these amounts are traceable to Peter Wahlen's bank fraud scheme, they are directly forfeitable and neither Peter nor Margaret Wahlen ever had a property interest in such criminal proceeds. Further, if one accounts for the appreciation that the Wahlens realized on the criminal proceeds, then $142,906.95 of the investment in the Door County property (61.6% of the net equity) was derived from criminal proceeds, as well as $150,849.60 of the $269,249.83 in net sales proceeds from the sale of the Beaver Dam property. The government maintains that Peter and Margaret's one-half marital interests in the property are determined only after the directly-forfeitable portion of the property is determined, and that Peter Wahlen retains a marital interest in the Door County property, even though he and Margaret transferred title to Margaret Wahlen's name in 1996 (after they jointly purchased it and improved it). Finally, the government argues that Peter's marital interest in the untainted portions of the Beaver Dam and Door County properties are subject to forfeiture as substitute assets, in partial satisfaction of the $1,167,932.86 money judgment of forfeiture against him.

### Findings of Fact

Peter F. Wahlen, d/o/b 5/19/39, formerly resided in Beaver Dam, Dodge County, Wisconsin, and is incarcerated in the United States Bureau of Prisons. (PFOF 1)[1] From approximately September 1, 1972, to June 30, 2001, he was employed by ANB in Beaver

---

[1]Any reference to "PFOF" is to the undisputed proposed findings of fact filed by the government on June 11, 2003.

Case 2:02-cr-00074-CNC   Filed 09/20/06   Page 6 of 42   Document 158

Dam, Wisconsin.  (PFOF 5)  From January 1986 through June 2001, Peter Wahlen defrauded ANB, where he worked as a bank officer, as well as the bank's customers, principally by converting monies that bank customers sought to invest in bonds through the bank.  (Docs. # 1, 8, 31)

Peter and Margaret Wahlen married on August 22, 1964.  (PFOF 3)   Margaret Wahlen petitioned for divorce in an action entitled *Margaret Wahlen v. Peter Wahlen*, Dodge County Circuit Court Case No. 02-FA-000239. (PFOF 3)  A divorce was granted in Columbia County on May 12, 2004, and default judgment was entered on May 20, 2004.

When this court entered its Preliminary Order of Forfeiture on October 9, 2002, Peter and/or Margaret Wahlen had ownership interests in the following real estate:  single family residence at 814 Lakeshore Drive, Beaver Dam, Dodge County, Wisconsin, and a single family home at 6482 HWY 57, Sturgeon Bay, Door County, Wisconsin.  (PFOF 10)  Margaret Wahlen formerly resided in Beaver Dam, and now resides at the Door County property in Door County, Wisconsin.  (PFOF 2)

To trace Peter Wahlen's criminal proceeds,  Patricia Frankenstein, a Senior Vice President and Cashier at ANB in Beaver Dam, Wisconsin, spent over 1000 hours reviewing records to determine when and in what amounts Peter Wahlen may have misappropriated funds from the bank, where the funds were transferred, and, to the extent possible, how those funds were used.  (Aff. Frankenstein, ¶¶ 1-4)  In the course of her analysis, Frankenstein reviewed the records of various bank and brokerage accounts held in the names of Peter Wahlen, Margaret Wahlen, or both, as well as the records of Enterprise Builders, the firm that built the home on the Wahlen's Door County property, along with loan and mortgage records for real properties that Peter and Margaret Wahlen owned.  (*Id.*, ¶ 5)

Through her tracing analysis, Frankenstein determined that one of the main ways Peter Wahlen misappropriated funds from ANB was having ANB cashier's checks issued to, and deposited into, accounts he held at Kemper Securities (Account No. 10809719469), Edward D. Jones & Co. (Account No. 15400631103), and at Morgan Stanley Dean Witter (Account No. 441-011993). Frankenstein prepared a series of charts showing the various diversions to Wahlen's investment accounts. (Aff. Frankenstein, Ex. A)

Frankenstein's tracing analysis reveals that all of the $537,989.82 that Peter Wahlen deposited into his Edward D. Jones Account between September 1986 and December 1994 were derived from his bank fraud scheme. (*Id.*, ¶ 9, Ex. B) All but $8,000 of the $446,814 deposited into Peter's MSDW Account were traced to the misappropriated funds. (*Id.*, ¶ 10, Ex. C) And, although records of Peter's Kemper Account were not available, ANB records reveal that at least $115,300 of misappropriated funds were deposited into Peter's Kemper Account. (*Id.*, ¶ 11, Ex. D)

The tracing analysis further shows that Peter Wahlen used funds misappropriated from ANB and its customers to purchase, improve, pay taxes on, and service debt on real property he owned. (*Id.*, ¶ 12) For example, Peter Wahlen made loan payments on several loans obtained from ANB using proceeds of his bank account scheme that he funneled through one of his investment accounts. (*Id.*, ¶ 13) Specifically, the tracing analysis reveals that Peter Wahlen used misappropriated funds to improve, service debt on, and pay real estate taxes on the Door County property and the Beaver Dam property. (*Id.*, ¶¶ 14-53) Peter Wahlen also invested misappropriated funds in the three real properties that the Wahlens sold before Peter's bank fraud scheme was discovered: a home in Randolph, Wisconsin, a cottage in Door County, and a vacant lot in Beaver Dam. (*Id.*, ¶ 14) The

-8-

Wahlens used proceeds from a loan secured by the Randolph property, which was serviced in part by misappropriated funds, and proceeds from the sale of the Beaver Dam vacant lot and Door County cottage, to finance the purchase and improvement of the Beaver Dam property and the Door County property. (*Id.*, ¶¶ 15, 29, 35)

Peter and Margaret Wahlen purchased the Randolph property in the 1960's and sold it on September 11, 1992, for $117,000. (PFOF 15(a)) No misappropriated funds were used to purchase or improve the Randolph property. (Aff. Frankenstein, ¶ 15) However, ANB Loan 91201, in the amount of $53,817.97, secured by the Randolph property, was repaid in part through $10,884 in misappropriated funds, which were drawn on Peter's Edward D. Jones Account (which itself consisted entirely of misappropriated funds). (*Id.*, ¶¶ 15, 33, 35, Ex. G) That misappropriation is accounted for in the analysis of the Door County Property, because the $53,817.97 loan secured by the Randolph Property was used primarily to obtain a $45,000 cashier's check that the Wahlens used to buy the vacant lot for the Door County property. (Aff. Frankenstein, ¶¶ 15, 33, 35) Nonetheless, Margaret Wahlen contends that it is impossible to make any distinction between which funds were misappropriated and which were tainted.

Peter and Margaret Wahlen acquired the Door County cottage on July 20, 1984, for $75,000. (PFOF 16) They paid for it with $25,000 in cash from personal funds, and $50,000 financed by ANB Loan No. 82762. (PFOF 16) The tracing analysis establishes that $37,084.59 in misappropriated funds -specifically, funds drawn from Peter's Edward D. Jones Account, ANB, cashier's check No. 92930, and the "ANB securities transaction" - were used to service Loan No. 82762. (Aff. Frankenstein, ¶ 17, Ex. E)

-9-

On March 2, 1992, the Wahlens sold the Door County cottage for $120,000. (PFOF 20)  Of that sum, $37,084.59 constituted directly traceable criminal proceeds.  The government contends that because the property appreciated 60%, another $22,350.75 (60% of the $37,084.59) of value was derived from criminal proceeds.  Thus, a total of $59,340.34 of the net sale proceeds from the Door County cottage constitute or were derived from Peter Wahlen's bank fraud scheme.  On the other hand, Margaret Wahlen argues that there are many reasons for appreciation of realty not addressed by Frankenstein and that it is beyond Frankenstein's expertise to allocate any investment appreciation.

The Wahlens used part of the $120,000 in proceeds from the sale of the Door County cottage to pay the $11,790.88 balance on Loan No. 82762 (originally used to fund the purchase of that cottage).  (Aff. Frankenstein, ¶ 18)  The remaining $108,209.12 in net sale proceeds were deposited into a savings account at ANB in Margaret's name, Account No. 139972.  (*Id.*)  Between July 28, 1992, and November 13, 1992, the Wahlens used those proceeds to pay for most of the first $108,940.94 of the $160,289.30 construction cost for their home on the Door County property.  (Aff. Frankenstein, ¶ 29 [table setting forth source of each payment to Enterprise Builders])  As of the time each of these payments was made to Enterprise Builders, the funds in Margaret's Savings I Account included proceeds of the sale of the Door County Cottage.  (*Id.*, ¶ 30)  This fund also contained separate money that Margaret received from her family.

Fifty-nine thousand, three hundred forty dollars, thirty-four cents of the net proceeds from the sale of the Door County cottage constituted or were derived from Peter Wahlen's bank fraud scheme.  Because these funds were used to finance the construction of the home on the Door County property, it follows that $59,340.34 of the first $108,940.94

Case 2:02-cr-00074-CNC   Filed 09/20/06   Page 10 of 42   Document 158

in payments made to Enterprise Builders to construct the home on the Door County property - all made from Margaret's Savings I Account – constituted or were derived from criminal proceeds generated by the sale of the Door County cottage.

Peter and Margaret Wahlen bought the Beaver Dam vacant lot on October 4, 1988, for $40,000. (PFOF 15(b)) They sold it on January 8, 1993, for $80,000. (*Id.*) Thus, during the roughly four years that the Wahlens owned it, the lot appreciated by $40,000 or 100 percent. (*Id.*)

The tracing analysis of the records concerning the purchase, loan servicing and the sale of the Beaver Dam vacant lot, reveals that Peter Wahlen used at least $18,288.46 in criminal proceeds to purchase and service loans used to purchase the property as follows:

      a.    $7,955.75 (from Peter's Edward D. Jones Account) were used to acquire the Beaver Dam vacant lot;

      b.    $6,332.71 (from Peter's Edward D. Jones Account and Kemper Account) were used to service two loans made to fund the acquisition of the property; and

      c.    $4,000 (from Peter's Edward D. Jones Account) were used to pay off the loan when the property was sold.

(Aff. Frankenstein, ¶ 27) Margaret Wahlen concedes that it appears that some misappropriated funds may have been used to finance the Beaver Dam vacant lot.

On January 8, 1993, the same date they sold the Beaver Dam lot, the Wahlens deposited the $80,000 sale proceeds into a savings account (No. 143347) held in Margaret's name at ANB (Margaret's Savings II). (PFOF) Between January 8, 1993, and September 17, 1993, the funds in Margaret's Savings II included the $80,000 gross sale proceeds from the sale of the Beaver Dam vacant lot and, in turn, the $36,576.92 of that amount traceable to criminal proceeds. Between January 13 and September 17, 1993, the Wahlens used

Case 2:02-cr-00074-CNC   Filed 09/20/06   Page 11 of 42   Document 158

$51,348.36 of those funds to make their last three payments to Enterprise Builders to complete the cost of constructing a home on the Door County property. (Aff. Frankenstein, ¶ 29)

Next, the Door County property was a vacant lot when Peter and Margaret Wahlen purchased it. (PFOF 35) They bought the land by quitclaim deed on August 17, 1990, and financed the $58,000 purchase price with: a $10,000 check written from a Wahlen joint checking account, a $3,000 check drawn from Peter's Edward D. Jones Account, and a $45,000 cashier's check, constituting proceeds from ANB Loan No. 91201 to Peter and Margaret Wahlen. (*Id.*)

Peter and Margaret Wahlen obtained ANB Loan No. 91201, in the amount of $53,817.97, on August 6, 1990. It was secured by the Randolph property, which had been financed with untainted funds. (PFOF 38) The loan proceeds were used to pay off an existing loan for $8,817.97, and the balance funded the $45,000 cashier's check used to buy the Door County property vacant lot. (*Id.*) Margaret Wahlen concedes that Peter Wahlen used $10,884 in misappropriated funds to service Loan No. 91201.

The Door County property was a vacant lot acquired from David and Elizabeth Clark and the quitclaim deed was recorded December 13, 1990. The Clarks acquired the lot in a trade from Margaret's cousins on the same day that they sold it to the Wahlens. Prior to that, the land had been in Margaret Wahlen's family since the 1800's.

During the summer of 1992, Peter and Margaret Wahlen contracted with Enterprise Builders to construct a house on the Door County lot. (PFOF 41) Enterprise Builders and other vendors and/or subcontractors were paid by Peter and Margaret Wahlen for improvements on the property. (PFOF 42) The following payments were made:

| DATE | AMOUNT | SOURCE OF FUNDS |
|---|---|---|
| July 28, 1992 | $17,500.00 | Margaret's Savings I |
| August 11, 1992 | $39,866.18 | Margaret's Savings I |
| September 18, 1992 | $39,424.31 | Margaret's Savings I |
| November 13, 1992 | $21,150.45 | Margaret's Savings I |
| January 13, 1993 | $16,454.27 | Margaret's Savings II |
| February 12, 1993 | $20,103.59 | Margaret's Savings II |
| September 17, 1993 | $14,790.50 | Margaret's Savings II |
| **Total Payments to Enterprise Builders** | **$160,289.30** | |

(PFOF 43)

As noted above in the section discussing the Door County property, $59,340.34 of the first $108,940.94 in payments to Enterprise Builders constituted or were derived from criminal proceeds from the Door County cottage. (PFOF 44) Likewise, $36,576.92 of the last $51,348.36 in payments made to Enterprise Builders to construct the home on the Door County property – from Margaret's Savings II Account – constituted or were derived from criminal proceeds traced to the Beaver Dam lot. Thus, $95,917.26 ($59,340.34 plus $36,576.92) of the $160,289.30 that the Wahlens paid to Enterprise Builders to build the Door County property home constituted or were derived from criminal proceeds. Another $16,300 in proceeds, withdrawn from Peter's Edward D. Jones Account, were applied to construction costs, after having first been transferred to the Wahlens' joint checking account.

The following table summarizes the criminal proceeds invested in the Door County property:

-13-

| AMOUNTS OF PROCEEDS | SOURCE OF CRIMINAL PROCEEDS INVESTED IN THE DOOR COUNTY PROPERTY |
|---|---|
| $3,000.00 | Funds from Peter's Edward D. Jones Account used to buy the Door County vacant lot |
| $10,884.00 | Funds used to service debt on Loan No. 91201 on Randolph property, the purchase money loan for the Door County property |
| $59,340.34 | Funds traceable from the Door County cottage ($37,084.59 in direct proceeds plus additional $22,250.75 derived from proceeds as a result of 60% appreciation of that property), which were deposited into Margaret's Savings I and then withdrawn to pay Enterprise Builders. |
| $36,576.92 | Funds traceable from the Beaver Dam vacant lot ($18,288.46 in direct proceeds plus additional $18,288.46 derived from proceeds as a result of 100% appreciation of that property), which were deposited into Margaret's Savings II then withdrawn to pay Enterprise Builders |
| $16,300.00 | Funds from Peter's Edward D. Jones Account, transferred to joint checking account, and then applied to cost of constructing Door County property house. |
| $15,365.69 | Payments for improvements to Door County property, funded by checks drawn on Peter's Edward D. Jones Account. |
| $1,440.00 | Real Estate property taxes paid with check drawn off of Peter's Edward D. Jones Account, payable to the Town of Jacksonport. |
| **$142,906.95** | **Total sum constituting or derived from criminal proceeds invested in the Door County Property** |

The known cost basis of the Door County property is approximately $233,654.99. And as of December 31, 2002, the fair market value of the property was $750,000, according to ANB's appraiser.

Peter and Margaret Wahlen bought the Door County property on August 17, 1990, and titled it as marital survivorship property. (PFOF 51) On October 15, 1996, Peter and Margaret executed a quitclaim deed conveying the property from Peter and Margaret Wahlen as survivorship marital property to Margaret Wahlen individually. The quitclaim deed

was recorded October 18, 1996, in the office of the Door County Register of Deeds.  (PFOF 52) However, neither ANB nor the government received notice of the quitclaim deed prior to October 12, 2001.  (PFOF 54)

Peter and Margaret Wahlen bought the Beaver Dam property located at 814 Lakeshore Drive on November 12, 1993.  (PFOF 56)  Before it was sold pursuant to this court's May 16, 2003, order, the Beaver Dam property was titled in the name of Peter and Margaret Wahlen as survivorhsip marital property.  (*Id.*)

The Wahlens paid $253,802 for the Beaver Dam property as follows: a $150,000 purchase money mortgage loan from ANB Loan No. 94980, and a $103,802 cashier's check from ANB.  (PFOF 57)

The source of funds for the $103,802 ANB cashier's check was:

| ITEM FUNDING CASHIERS' CHECK | SOURCE OF PAYMENT |
|---|---|
| $28,000.00 | Check drawn off Peter Wahlen's Edward D. Jones Account No. 15400631103 [Criminal Proceeds] |
| $3,500.00 | Check drawn off Peter Wahlen's Kemper Securities Account No. 10809719469 [Criminal Proceeds] |
| $15,951.60 | Withdrawal from Margaret Wahlen's Savings III No. 142722 |
| $47,418.69 | Withdrawal from Margaret Wahlen's Savings II No. 143347 |
| $4,569.33 | Withdrawal from Margaret Wahlen's Savings I No. 138972 |
| $4,362.38 | ANB cashier's check No. 4732853172 issued to Peter and Margaret Wahlen |
| **$103,802.00** | **Total amount of cashier's check** |

(PFOF 58)

-15-

Peter Wahlen used $55,000 in misappropriated funds to service the Beaver Dam Property Loan No. 94980. (PFOF 60; Aff. Frankenstein, ¶ 41, Ex. H) Margaret Wahlen submits that untainted funds were also used to service the Beaver Dam property but has not verified the sources and amounts that were applied.

Additional misappropriated funds were used by Peter Wahlen to pay real estate property taxes on the Beaver Dam property as follows:

| AMOUNT | PAYEE | SOURCE |
|---|---|---|
| $1,602.00 | 1992 Beaver Dam property taxes | Peter's Edward D. Jones Account |
| $2,695.00 | 1995 Beaver Dam property taxes | Peter's MSDW Account |
| $2,585.00 | 1996 Beaver Dam property taxes | Peter's MSDW Account |
| **$6,882.00** | **Total Beaver Dam property taxes paid with criminal proceeds** | |

The Beaver Dam property was sold on May 16, 2003, in two parcels, for $420,000, as shown by the Report of Sale. (PFOF 64) After payment of commissions, taxes, closing costs and the first mortgage lien, the net proceeds due sellers total $269,249.83. Given the $253,802 purchase price and the $420,000 sale price, the Beaver Dam property appreciated by $166,198, or 65.48%, while Peter and Margaret Wahlen owned it. (PFOF 65)

The following table sets forth the $269,249.83 in net sales proceeds from the sale of the Beaver Dam property that constitute or were derived from proceeds of Peter's bank fraud scheme:

| PROCEEDS REALIZED FROM | SOURCE OF FUNDS INVESTED IN DOOR COUNTY PROPERTY |
|---|---|
| $52,126.20 | Proceeds of $31,500 from Peter's Edward D. Jones and Kemper Accounts used to purchase the Beaver Dam property, plus the $20,626.20 in appreciation derived from those proceeds as a result of the 65.48% appreciation of the property. |

| | |
|---:|:---|
| $91,841.40 | Proceeds of $55,500 from the Edward D. Jones and Peter's MSDW Accounts used to service mortgage loan plus $36,341.40 in appreciation derived from those proceeds as a result of the 65.48% appreciation of the property. |
| $6,882.00 | Proceeds from Peter's Edward D. Jones or MSDW Accounts used to pay 1992, 1995, and 1996 Door County property taxes. |
| **$150,849.60** | **Amount of net equity in Beaver Dam Property constituting or derived from criminal proceeds.** |

If the appreciation factor of 65.48% is excluded, the total criminal proceeds directly traceable to the Beaver Dam property amount to $93,882. (Aff. Frankenstein, ¶ 65) On the other hand, if the appreciation derived from proceeds is subject to direct forfeiture, $150,849.60 of the $269,249.83 in net proceeds from the sale of the Beaver Dam property would be subject to forfeiture.

Margaret Wahlen denies that it is possible to determine whether those monies were tainted because they came from accounts which were commingled with untainted funds more than once. Further, she submits that there are many reasons for appreciation not addressed by Frankenstein and are beyond her expertise, thereby making it impossible to allocate the basis for any appreciation.

### Analysis

As a starting point, the purpose of the forfeiture laws is to deprive the perpetrator of his ill-gotten gains. *United States v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003) ("forfeiture is gain based"). Consequently, Title 18, Section 982(a)(2) of the United States Code provides:

> The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate - (A) section ... 1344 of this title, affecting a financial institution ... shall order that the person forfeit to the United States any property constituting, or derived

from, proceeds the person obtained directly or indirectly, as the
result of such violation.

The statute also incorporates the provisions of Title 21, United States Code Section 853, which provides that all right, title and interest in the property vests in the United States upon the commission of the act giving rise to forfeiture. 21 U.S.C. § 982(b)(1) (expressly incorporating the provisions of 21 U.S.C. § 853); 21 U.S.C. § 853(c). When real property contains both forfeitable and nonforfeitable value, the district court must try to determine which is which. *Genova*, 333 F.3d at 763. In addition, any forfeitable property subsequently transferred to a person other than the defendant may be ordered forfeited unless the transferee establishes in a hearing that she is a "bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section." *Id.*

Here, the parties agreed to brief the forfeiture issue in accordance with Rule 56 of the Federal Rules of Civil Procedure. Fed R. Crim. P. 32.2(c)(1)(B)). Margaret Wahlen is required to establish by a preponderance of the evidence that she had a vested or superior legal right, title, or interest in property otherwise subject to forfeiture when defendant's criminal acts took place or that she was a bona fide purchaser for value. 21 U.S.C. § 853(n)(6).

The government argues that Margaret Wahlen never had a vested interest in those portions of the property derived from criminal proceeds, and that a significant portion of the properties' equity is traceable to criminal proceeds. Further, the government maintains that those portions of the property derived from criminal proceeds vested in the United States the moment the criminal proceeds were invested in the property, and Margaret's marital interest can be determined only after the equity constituting directly forfeitable property is assigned to the government.

The government's argument is premised on the relation back doctrine codified at 21 U.S.C. § 853(c). Moreover, the government cites *United States v. Martinez,* 228 F.3d 587, 590 (5th Cir. 2000), which applied the relation back doctrine in an ancillary proceeding to a RICO forfeiture action. *Id.*, 228 F.3d at 589. In *Martinez*, the Fifth Circuit Court of Appeals held that a wife did not have a community property interest in assets acquired by a defendant with proceeds of a RICO operation. *Id.,* 228 F.3d at 590.

On the other hand, Margaret Wahlen asserts that *Martinez* offers no guidance because all of the assets, except one, in which the wife claimed an interest in were purchased solely with proceeds from a RICO operation. This court notes that, in a footnote, the Fifth Circuit observed that the wife had waived any argument that summary judgment was inappropriate because she and the defendant had invested legitimate funds in the forfeited properties. *Id.*, 228 F.3d at 589, n. 3.

Margaret Wahlen submits that RICO cases which address forfeiture are only instructive to the extent that they deal only with the forfeiture of a defendant's property. *See United States v. Totaro*, 345 F.3d 989, 997 (8th Cir. 2003) (Because the statute provides for forfeiture of only the RICO defendant's property, there are no circumstances in which the property of an innocent owner is lawfully forfeited pursuant to § 1963). Consequently, she argues that the court must begin with the applicable state law. *United States v. Ben-Hur*, 20 F.3d 313, 317 (7th Cir. 1994) (state law determines legal interest of claimant under § 853(n)); *United States v. Alcaraz-Garcia,* 79 F.3d 769 (9th Cir. 1996).

Under Wisconsin law, all property of spouses is presumed to be marital property. Wis. Stat. § 766.31(2). Each spouse has a present undivided one-half interest in each item of marital property. Wis. Stat. § 766.31(3).

-19-

Section 766.55(2)(cm) provides:

> An obligation incurred by a spouse during marriage, resulting from a tort committed by the spouse during marriage, may be satisfied from the property of that spouse that is not marital property and from that spouse's interest in marital property.

In *Bothe by Gross v. American Family Insurance Company*, 159 Wis. 2d 378, 380 (Ct. App. 1990), the Wisconsin Court of Appeals concluded that the intent of § 766.55(2)(cm), Stats., is to protect an innocent spouse from liability for torts committed by the other spouse. Further, Wis. Stat. § 766.31(10) allows spouses to "reclassify their property by gift, conveyance, as defined in § 706.01(4), signed by both spouses, martial property agreement, written consent under § 766.61(3)(e) or unilateral statement under § 766.59...." For example, in 1996 the Door County Property was assigned as individual, separate property to Margaret.

Under Margaret's theory, her individual marital interests in the Door County and Beaver Dam properties vested in her, rather than Peter Wahlen, from the moment she married and began acquiring community property with Peter Wahlen. According to Margaret Wahlen, neither parcel was used for nor derived from criminal activities, although she acknowledges that stolen monies were commingled with legitimate funds and were used in purchasing or maintaining the properties. Therefore, she argues that the government must proceed under a substitute property statute, 21 U.S.C. § 853(p), which provides:

> if any of the property described in subsection (a) of this section, as a result of any act or omission of the defendant -
>
> (1) cannot be located upon the exercise of due diligence;
> (2) has been transferred or sold to, or deposited with, a third party;
> (3) has been placed beyond the jurisdiction of the court;
> (4) has been substantially diminished in value; or
> (5) has been commingled with other property which cannot be divided without difficulty;

-20-

the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

In addition, an innocent spouse's undivided one-half interest in community property is not subject to forfeiture as substitute property. *United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996).

Margaret Wahlen relies upon *In Re The Marriage of Lynn Danette Curda-Derickson v. Richard DuWayne Derickson*, where the Wisconsin Court of Appeals held that the right to reach property to satisfy a restitution order is driven solely by the classification into which the obligation falls under Wis. Stat. § 766.55. 266 Wis. 2d 453, 668 N. W. 2d 736 (Ct. App. 2003). Noting that the husband/defendant had committed a "horrendous property crime that continued on over many, many years," and that the wife "had no active part in the taking of this money," the restitution order in the *Derickson* case was classified solely as the defendant's obligation according to the provisions of § 766.55(2)(cm). *Id.*, 266 Wis. 2d at 467.

While seemingly on point, the Court of Appeals commented at footnote 5 that it was not addressing a case involving co-mingled funds:

> We note that this decision does not preclude an action in rem by a creditor to realize on a lien on property that was part of the marital estate. For example, if the government should choose to foreclose on its lien for the restitution order that is an encumbrance on the Valley Road property, it could do so. However, Lynn would not be personally liable if the price obtained for the property was insufficient to satisfy the lien. Similarly, this decision does not address whether Wis. Stat. § 766.55(2)(cm) protects the property of an innocent spouse where a marital property division granting property to the innocent spouse is entered prior to the resolution of a criminal or tort action against the other spouse and the property awarded to the innocent spouse was acquired in whole or in part with money obtained by the tortious act of the other spouse.

*Id.,* 266 Wis. 2d at 468, n. 5.

Ultimately, the government has met its burden in establishing that a significant portion of criminal proceeds were used to buy, improve and maintain the Beaver Dam and Door County Properties. Even Margaret Wahlen concedes that over $1,000,000 of Peter Wahlen's criminal proceeds were deposited into brokerage accounts (Doc. # 56-4, ¶¶ 4-6), and that they "appear" to have been used to buy, improve and maintain their properties. (*Id.*, ¶¶ 7-11)

Nevertheless, Margaret Wahlen maintains that she used $10,525 of her separate funds for the purchase of the Door County Cottage, and $6,000 of her separate funds for the purchase of the Beaver Dam Lot. Margaret Wahlen argues further that her family gifted half the value of the Door County Lot to her; the fair market value of the land according to the state's tax assessment is $285,200 (one-half this amount is $142,650); and that $70,574.76 of her separate funds was for the construction of the Door County house. (Decl. Margaret Wahlen, ¶ 28) Citing appreciation and a homestead exemption, Margaret contends that she has a $282,064.76 interest in these properties before any division. With respect to the purchase of the Beaver Dam House, Margaret Wahlen claims that she used $20,313.98 of her separate funds.

There are several problems with these arguments. First, the Door County Cottage was owned in joint tenancy, and the loan was serviced through stolen funds. By transferring separately owned property into a joint tenancy, Margaret Wahlen changed the character of the ownership interest in the entire property into marital property. *Fowler v. Fowler*, 158 Wis. 2d 508, 518, 463 N.W.2d 370, 373 (Ct. App. 1990). Second, state law arguments regarding Margaret Wahlen's property interests cannot be reconciled with the

-22-

federal forfeiture statute or the Supremacy Clause. While state law determines whether she has a superior property interest, federal law determines whether or not that interest can be forfeited. *See Lester*, 85 F.3d at 1412. When the relation back doctrine is applied in this case, title vested in the government when Peter Wahlen committed his crimes. Consequently, the court finds that the tainted portions of the Door County and Beaver Dam properties are directly forfeitable, and that neither Peter nor Margaret Wahlen had a property interest in the criminal proceeds derived from those properties. It follows that the portions of the real properties which are subject to forfeiture include appreciation attributable to the criminal proceeds. Also, Peter and Margaret Wahlen's marital property interests are determined after the directly forfeitable portion of the property is determined and the untainted portions of Peter Wahlen's marital property interest is subject to forfeiture as a substitute asset.

### DEFENDANT PETER F. WAHLEN AND MARGARET WAHLEN'S OPPOSITION TO FORFEITURE OR GARNISHMENT

The government's motion for partial summary judgment was limited the Door County and Beaver Dam properties and did not address Peter Wahlen's interest in any other assets. Rather, the government moved to amend the order of forfeiture and instituted garnishment actions. Nevertheless, Peter Wahlen filed a brief in opposition to forfeiture of his ERISA based pension plans, ESOPS and IRA accounts. Margaret Wahlen addressed the forfeiture of the retirement accounts in her brief opposing the government's motion for partial summary judgment. At a January 25, 2005, hearing, the court granted Margaret Wahlen's request for time to conduct discovery regarding these issues and set deadlines for additional briefs on these issues.

-23-

Subsequently, the government filed a motion to amend the final order of forfeiture to include certain substitute property of Peter Wahlen. The motion seeks to divest Peter Wahlen of his property interest in the individual retirement accounts held in his name and Margaret's name, as well as Peter Wahlen's interest in the American National Bank Employee Stock Ownership Plan, via garnishment. However, to the extent that any portion of Peter Wahlen's interest in any IRA is not subject to garnishment, the government intends to divest him of such property interest by having that interest forfeited as a substitute asset.

The court could grant the government's motion to amend without any further argument, because Margaret Wahlen's recourse is to file an ancillary claim if the court amends the final order of forfeiture. However, Peter and Margaret have opposed this course as a "colossal waste of time" and have requested the court to resolve this issue.

In support of her position, Margaret Wahlen filed a "Statement of Relevant Facts" but did not set forth proposed findings separately as typically required on a summary judgment motion. Hence, the court will state its additional findings below to the extent they are supported by the record.

Margaret Wahlen received her property from various sources, including gifts from family members, inherited funds, interest or dividend checks from other investment accounts, or income from a few small jobs. (Decl. Margaret Wahlen, ¶ 3) During the 1980's she worked as a color consultant and was a part owner in the Fieldstone Gallery from 1988-1996. (*Id.*)

Margaret Wahlen's family owned a farm in the Town of Randolph in Columbia County. (Decl. Margaret Wahlen, ¶ 4) The farm is still running and continues in her family.

-24-

(*Id.*)  In 1966, Margaret's family began giving her money.  (*Id.)*  Her uncle, E.M. Heidt (Bud), was very good to her and gifted her a great deal of money.  (*Id.*, ¶¶ 6-9)

From 1967 to 1975, Margaret Wahlen helped her grandmother, Margaret Campbell Heidt, run the farm on a daily basis.  (Decl. Margaret Wahlen, ¶ 5) Uncle Bud, who never married and had no children, ran the farm.  (*Id.*)  Margaret Wahlen did all the house work, cooked for the farm hands (anywhere between two to sixteen people), managed the farm accounts, cared for the animals, and performed other jobs.  (*Id.*)

When Margaret Wahlen's grandmother was alive she gave Margaret many gifts and money for the farm.  (Decl. Margaret Wahlen's, ¶ 5) Margaret received money for each birthday and Christmas and approximately $600 additional money each year.  (*Id.*)  Margaret also received money from her grandmother upon her death.  (*Id.*)

Margaret Wahlen's grandmother told Uncle Bud that Margaret was to receive an inheritance greater than that left to other grandchildren.  (Decl. Margaret Wahlen, ¶ 6) She told Bud to give Margaret half of whatever he inherited.  (*Id.*)  From 1966 to 1976, Bud gifted part of the money Margaret was to receive from her grandmother.  (*Id.*)  For each of these years, Margaret received about $2,000 from Bud.  (*Id.*)   Bud always gave Margaret money for her birthday and Christmas too.  (*Id.*)

In about May of 1976, Bud began living with Margaret and Peter Wahlen.  (Decl. Margaret Wahlen, ¶ 7) It was assumed by Margaret's family that she would take care of him in his later years.  (*Id.*)  Bud lived with Margaret for over 12 years.  (*Id.*)

From 1976 through 1978 Margaret Wahlen received at least $2,400 per year from Bud.  (Decl. Margaret Wahlen, ¶ 8) In 1979 that increased to about $3,000 per year.

(*Id.*)  In 1980 or 1981, Margaret received $3,500 from her grandmother's estate through Bud. (*Id.*)  During the 1980's the amount she received from Bud increased to about $4,000 per year.  (*Id.*)  In 1980 or 1981, Margaret received $3,500 from her grandmother's estate through Bud.  (*Id.*)  In 1990, Bud went to live with his sisters, but continued to gift money to Margaret. (Decl. Margaret Wahlen, ¶ 9)

Margaret Wahlen also received money from her parents during these years. (Decl. Margaret Wahlen, ¶ 19)  Her parents gave her money for her birthday and Christmas as well as other monetary gifts throughout the year.  (*Id.*)  Margaret's father purchased a MetLife Insurance Policy in 1961 for Margaret as a gift.  (*Id.*, ¶ 24)  Ordinarily, Margaret Wahlen saved the money she received from her family, but did spend some of it.  (*Id.*, ¶ 18) She always deposited money into her own accounts and did not share her money with Peter. (*Id.*)  Margaret Wahlen always had separate accounts.  (*Id.*)  It was her intention, and Peter agreed, that her money was supposed to stay on her side of the family.  (*Id.*)

Margaret Wahlen does not have records of her first accounts, which were held at First National Bank.  (Decl. Margaret Wahlen, ¶ 10)  Eventually, Margaret transferred her money to the Bank.  (*Id.*, at ¶ 11)  Her first account at the Bank was Account No. 12683.  (*Id.*) Margaret used this account as her base savings and deposited all of her gifted and inherited funds into it.  (*Id.*)  Other deposits to this account consisted of her color consultant income, interest and dividends.  (*Id.*)

At a minimum, Margaret Wahlen received a $4,184.94 gift from Bud in 1983 and $4,763.51 in 1984.  (Decl. Margaret, ¶ 12)  She does not have records on this account from

-26-

1985 to 1986. (*Id.*) Margaret closed this account in 1988 and transferred the funds to another savings account held at American National, Account No. 138972. (*Id.*)

During the early 1980's, Margaret Wahlen had a Cash Equivalent Money Market Portfolio at the United Missouri Bank, Account No. 9201955. (*Id.,* ¶ 13) This account started in 1982. (*Id.*) The deposits into this account included money received from her family. (*Id.*) Margaret used $7,200 of these funds to purchase the Door County Cottage. (*Id.*) Also, funds from this account were used to purchase a Wal-Mart bond (through Edward Jones) on or around September 17, 1985, for $10,000. (*Id.*) Dividend paid by the Wal-Mart bond were spent or put into Margaret's savings. (*Id.*) The dividend payments were between $200 and $500 per month. (*Id.)*

On February 18, 1987, Margaret Wahlen started her Edward Jones IRA with $7,507.75 of these funds. (*Id.*) She closed this account on October 4, 1989, and deposited the balance of $2,800.22 into Account No. 138972 at ANB. (*Id.*)

Margaret Wahlen had Account No. 138972 from the 1980's through 2002. (Decl. Margaret Wahlen, ¶ 14) Margaret's earliest records for this account begin in 1988 which is when she believes she opened the account. (*Id.*) This account was closed in 2002. (*Id.*) Deposits into Account No. 138972 include income from the gallery, dividend checks from the Wal-mart bond, money from Bud, her mother, her Aunt Barb, and other gifts. (*Id.*) If marital funds were deposited into this account it was either a mistake by the Bank which Margaret corrected or money Peter owed to her. (*Id.*) Margaret Wahlen took reasonable steps to keep her money separate. (*Id.*)

-27-

In 1991, Margaret Wahlen inherited $13,902.71 from Alice Mittag, her father's cousin. (Decl. Margaret Wahlen, ¶ 15) On February 7, 1992, Margaret opened and deposited these funds into Account No. 142722 at ANB. (*Id.*) Other deposits into this account include gifted funds from her Aunt Barbara, her father's cousin, totaling $11,350 and $2,000 from another relative's estate. (*Id.*) In total, including interest, this account included $28,650.25 of Margaret's separate funds. (*Id.*) On August 23, 1996, she closed this account and transferred the remaining $10,198.65 to the Morgan Stanley Account. (*Id.*)

In 1992, Margaret Wahlen opened Account No. 143347 at ANB. (Decl. ¶ 16) This was the Wahlen's house account into which proceeds from the sale of the Randolph House and the Beaver Dam vacant lot were deposited. (*Id.*) Previously, $6,000 of Margaret's separate funds were used to purchase the Beaver Dam house. (*Id.*)

The Wahlens used $47,418.69 from Account No. 143347 proceeds as part of the down payment on the Beaver Dam house. (*Id.*) The remaining funds from this account were used to pay for the Wahlens' daughter's wedding and for work on the Door County house. (*Id.*) However, Margaret has no knowledge whether any stolen funds were used to purchase the Beaver Dam vacant lot. (*Id.*)

Uncle Bud passed away in 1996 and Margaret Wahlen inherited $87,954.93 from his estate. (Decl. Margaret Wahlen, ¶ 18) Most of the funds were deposited into Account No. 138972. (*Id.*) Eventually, the money in this account was transferred into Margaret's Morgan Stanley Account through purchases of stock and other securities. (*Id.*)

Margaret Wahlen's mother gifted over $82,562.20 to her during her life. (*Id.*, at ¶ 18) Some of this was deposited into the Morgan Stanley Account. (*Id.*)

Margaret Wahlen took deliberate steps to keep her money separate from the marital estate.  (*Id.*, ¶ 23)  On the other hand, the Wahlens did not really discuss their separate investment accounts.  (*Id.*)  However, occasionally Margaret Wahlen would ask Peter's opinion on the purchase of a stock and he would complete the transaction.  (*Id.*)

Peter Wahlen put his income from his tax service, estate planning, directors fees and accounting work into his accounts.  (*Id.*)  Other legitimate income was deposited into their joint checking at Associated Bank.  (*Id.*)  If Peter's money got into Margaret's accounts, it was done without her knowledge or permission; Peter was reimbursing Margaret for something else for which she paid; or the Bank made a mistake and put funds in the wrong account. (*Id.*)

Margaret Wahlen started her Morgan Stanley account in 1994.  (Decl. Margaret Wahlen, ¶ 20) In 1990, she opened a security account with Kemper/Blunt Ellis & Loewi.  (*Id.*)  Margaret closed her Kemper account in late 1993 with a balance of $417,591.77 and used the funds to open her Morgan Stanley account.  (*Id.*)  Eventually, all of the funds in Margaret's separate savings accounts at the ANB went into her Morgan Stanley account.  (*Id.*)

On March 25, 1998, Margaret Wahlen started a Roth IRA with funds from her Morgan Stanley account.  (*Id.*)  She tried to make the allowed annual contributions each year. (*Id.)*  Margaret started two subaccounts for her grandsons when they were born - April 17, 1996, and September 4, 1998, respectively.  (*Id.*)  As of November 30, 2004, Margaret's Morgan Stanley Account was worth $281,871.63; her Roth IRA was worth $6,572.82 and her grandsons' accounts were worth $9,385.89 and $11,625.95.  (*Id.*)

Margaret Wahlen started her Edward Jones IRA in 1985 with an initial deposit of $8,495. (Decl. Margaret Wahlen, ¶ 21) Over the years, she may have made contributions to the account with additional funds, but believes the account increased in value due to growth. (*Id.*)

In 1987, Margaret Wahlen started her American Funds account. (Decl. Margaret Wahlen, ¶ 22) She used funds from a savings account that contained her separate funds. (*Id.*) Margaret speculates that she made contributions to this over the years with her separate funds.

Finally, Margaret Wahlen believes that Peter Wahlen used his stolen funds to purchase stocks on margins and lost most of it "gambling" on the stock market. (Decl. Margaret, ¶¶ 31, 35) A great deal of what Margaret and Peter accumulated was due to the advantages provided by Margaret's family. (Decl. Margaret, ¶¶ 32, 34, 35, 36) Margaret inherited many nice, expensive things from her relatives (e.g. Bud bought her a fur coat, Aunt Alice gave Margaret her silver, Margaret's grandmother gave her a dining room set). *Id.,* at 34. Throughout their marriage, Peter bought Margaret one ring and one bracelet which cost little more than $500. (*Id.*) Their country club membership cost $450 per year (but in the early years was only $30 per year.) *(Id.,* at ¶ 35) Margaret's parents gave them stock to join the club. (*Id.*) Also, Peter and Margaret did not travel, own expensive cars or eat at expensive restaurants. (*Id.*)

Attorney fees and other payments were withdrawn from the Wahlen's US Bank IRA. (Decl. Margaret Wahlen, ¶ 33) Those withdrawals include a penalty but not taxes. (*Id.*) Peter's pension in the US Bank account is Margaret's only stream of income for the rest of her life. (*Id.,* at ¶ 31)

Margaret Wahlen first argues that the following property is individual property: (1) Margaret's Morgan Stanley Accounts ( including two subaccounts of her grandsons); (2) Margaret's Roth IRA; (3) Margaret's Edward Jones IRA; (4) Margaret's American Funds IRA; and (5) Margaret's MetLife Insurance Policy. She bears the burden of establishing that this is not marital property. *In Matter Estate of Lloyd,* 170 Wis. 2d 240, 254, 487 N.W. 2d 647 (Ct. App. 1992).

Margaret Wahlen's property interests are determined by the Wisconsin Marital Property Act, Wis. Stat. ch. 766. The Wisconsin Statutes create a presumption that all property is marital property. Wis. Stat. § 766.31(2). However, property acquired by a spouse as a gift or inheritance during marriage is considered individual property. Wis. Stat. § 766.31(7)(a). On the other hand, income earned from individual property during marriage is marital property. Wis. Stat. § 766.31(4). Generally, mixing martial property with other property reclassifies the other property to marital property unless the non-marital component can be traced.

In *Estate of Lloyd,* the Wisconsin Court of Appeals explained the concept of direct tracing as follows:

> Direct tracing can be accomplished by using an investment account. *Id.,* sec. 3.21a, at 3-12. Direct tracing constitutes actual proof of the classification from the initial receipt of the funds to the point at issue. *Id.* Unless a unilateral statement is executed, the spouse not only must record each deposit and each expenditure, but also must maintain a record of interest earned on individual property and predetermination date property. That interest is marital property. Section 766.01(10), Stats. If tracing proves impossible at any point in an asset's history, the asset is transformed to marital property. See sec. 766.63(1), Stats.

*Estate of Lloyd*, 170 Wis. 2d at 257; Wis. Stat. 766.63(1).

-31-

During a July 14, 2005, hearing, this court ruled that $12,320.13 of Margaret Wahlen's Morgan Stanley Account, No. 441-105017 constituted criminal proceeds and were subject to direct forfeiture. In May of 1995, Peter Wahlen transferred $2,320.13 of stolen funds from his Morgan Stanley Dean Witter Account to Margaret's account. (Second Aff. Frankenstein, Ex. AA) In addition, on December 15, 1997, Peter Wahlen transferred $10,000 from his Morgan Stanley Dean Witter Account to Margaret's account. In the prior two months, Peter had deposited $43,839.08 that had been stolen from ANB into his Morgan Stanley Dean Witter Account. (*Id.*) Patricia Frankenstein determined that all but $8,000 of the $446,814 deposited into Peter's Morgan Stanley Dean Witter Account can be traced to misappropriated funds. Moreover, Peter has admitted that the "great majority" of his deposits into the account "were monies that he wrongfully obtained from American National bank or its customers." (Aff. Frankenstein, ¶ 10, Ex. C; Def.'s Responses to Government's Request for Admissions, Answer to Request No. 1)

Margaret Wahlen started the Morgan Stanley account on January 11, 1994, with funds from a Kemper account that she closed in late 1993 with a balance of $17,591.77. (Decl. Margaret Wahlen, ¶ 20; Second Supp. Aff. Frankenstein, ¶ 13, BB) However, Margaret cannot identify the source of the funds she used to open and fund the Kemper account and has no monthly statements for the account for any period before October of 1990. (Decl. Margaret Wahlen, ¶ 20, Ex. M) In her April 29, 2005, deposition, Margaret Wahlen testified that she could not identify the source for the initial deposit to the account. (Dep. Margaret Wahlen, pp. 68, 104)

Margaret Wahlen believes that $10,198.65 of the funds in the Morgan Stanley Account came from savings, Account No. 142722 at ANB that she closed in 1996. (*Id.,* at

-32-

¶ 15) This account contained funds she inherited from her Aunt Alice Mittag and funds gifted from her cousin Barbara. (*Id.*)

Patricia Frankenstein's summary exhibit identifies the deposits to Margaret Wahlen's Morgan Stanley Dean Witter Account. (Second Supplemental Affidavit of Patricia Frankenstein, ¶ 13, Ex. BB) The exhibit documents fifteen deposits into the account between January 11, 1994, and February 22, 1999. With the exception of the $17,501.82 transfer from the Kemper account and a $10,000 deposit from funds from Margaret's ANB Savings Account No. 142722, all of the deposits were funded by transfers from Margaret's ANB Savings Account No. 138972 and Peter's Morgan Stanley Dean Witter Account.

Significantly, any gifts and inheritances that Margaret Wahlen deposited into Account No. 138792 were commingled with the following marital property: Peter's earnings, directors' fees, tax preparation fees, and personal representative fees, as well as Margaret's earnings from a business she co-owned, the proceeds from the sale of Margaret's business, dividends from a Wal-mart bond, proceeds from the sale of real estate that was marital property, and deposits from unidentified sources. (Second Supplemental Aff. Patricia Frankenstein, ¶ 6, Ex. AA; Decl. Margaret Wahlen, ¶ 14; Dep. Margaret Wahlen, pp. 76-77, 83-88, 90 and 198) Further, Margaret Wahlen cannot identify the source of the deposits into ANB Savings Account No. 138972. (Dep. Margaret Wahlen, pp. 116-125)

Moreover, Margaret Wahlen is unable to show that the initial deposit to ANB Savings Account No. 138792 was individual property. She opened the account with a transfer from a pre-existing account at ANB (No. 12863), which she closed on February 10, 1988, with a balance of $9,100.44. (Decl. Margaret Wahlen, Ex. D) She opened Account No. 138972 on February 9, 1988, with a deposit of $9,196.85. (Decl. Margaret Wahlen, Ex. G) However,

-33-

Account No. 12863 was a comingled account as Margaret concedes in her declaration. (Decl. Margaret Wahlen, ¶ 11 (deposits included income as a consultant, interest, dividends, and gifts and money from Uncle Bud).

In addition, Margaret Wahlen acknowledged in her deposition that some of the payments she received from Uncle Bud were reimbursements because she did all of the shopping for him while he lived with them for at least twelve years. (Dep. Margaret Wahlen, pp. 22-24, 47-48) Also, she conceded that she may have purchased items with funds from her joint checking account with Peter and then deposited the reimbursement in the 12863 savings account. (Dep. Margaret Wahlen, p. 23) Also, Margaret cannot distinguish which payments were reimbursements and which were gifts. (Dep. Margaret Wahlen, pp. 24, 47-55, 100) Consequently, $12,320.13 of Margaret's Morgan Stanley Account will be forfeited off the top; one-half of the remainder of the account will be subject to garnishment as the marital asset of Peter.

Margaret Wahlen's Roth IRA as well as two accounts in her grandson's names are contained within her Morgan Stanley Account. (Margaret Wahlen, ¶ 19) Margaret set up her grandsons' accounts around the time they were born on April 12, 1996, and September 4, 1998, respectively. (*Id.*) Funds in the Roth IRA account were carved into subaccounts for her grandsons. (*Id.*) However, because Margaret cannot demonstrate that the Morgan Stanley account in her name was individual property, she cannot show that the initial investment in her Roth IRA was individual property.

The evidence submitted by Margaret Wahlen respecting her Edward Jones IRA is inconsistent. She claims that she opened the account on February 18, 1987, using $7,507.75 drawn on her Kemper account. (Decl. Margaret Wahlen, ¶ 13) In the same

-34-

Declaration, Margaret states that she started the American Funds IRA in 1987 with a deposit from her Cash Portfolio in the amount of $7,507.75. (Decl. Margaret Wahlen, ¶ 21, Ex. E MGWHALEN 00320) However, at paragraph 21 of her declaration, Margaret Wahlen states that she started her Edward Jones IRA in 1985 with $8,495. (Decl. Margaret Wahlen, Ex. N, 00007) Regardless, she never identifies the source of the initial deposit or explains how the account grew in value. (Decl. Margaret Wahlen, ¶ 21) Consequently, the Edward Jones IRA is marital property.

Likewise, the American Mutual Fund, Account No. 56965461-01, is marital property. On February 19, 1987, Margaret Wahlen bought 509 shares of the Washington Mutual Investment Funds (later renamed American Funds) for $7,507.75. The check register for her Kemper account references a February 18, 1987, check in the amount of $7,507.75 to "Am. Nat. Bank - Washington Mutual Inv. Fund" which suggests that the Kemper account was the source of the investment. However, Margaret cannot identify the source of the funds used to open the Kemper account. And, without any statements for the period that the Kemper account was open, Margaret is unable to show that the American Funds account was individual property.

Further, the only records from the American Mutual Fund account are dated 1991 to 2004. With each quarter, the fund paid a dividend which was used to buy more shares, and dividends are marital property. On March 22, 1991, the account had 679.406 shares and on June 30, 2004, there were 1595.261 shares. To the extent that the difference is attributable to dividends, dividends are marital property even when the underlying investment is individual property. Accordingly, this court has concluded that the American

Case 2:02-cr-00074-CNC   Filed 09/20/06   Page 35 of 42   Document 158

Mutual Funds Account is marital property in which Peter Wahlen has an undivided one-half interest.

The MetLife insurance policy was purchased by Margaret's father for her in 1961. (Decl. Margaret Wahlen, ¶ 24) Although Margaret speculates that she tried to pay the premiums with her separate funds, she offers no evidence to support her statement. (*Id.*) Because the premiums constitute the bulk of the value of the policy, she has failed to overcome the presumption of marital property.

The remaining issue for this court is whether the government may garnish Peter Wahlen's interest in the US Bank IRA and Peter Wahlen's employee stock ownership program. Briefly, Peter Wahlen was a participant in the ANB employee pension benefit plan. ANB was the trustee of the plan, however, in the 1990s, ANB switched to Firstar, which was acquired by US Bank. ANB required that every employee on retirement remove their funds from the plan and manage their own funds. In 2001, Peter created an IRA at US Bank and rolled his pension funds into it. That IRA was awarded in its entirety to Margaret Wahlen as part of her property division in her divorce from Peter. (Decl. Bolger, ¶ 3)

Peter and Margaret Wahlen argue that the pension accounts are covered by the anti-forfeiture and anti-alienation clauses of ERISA. *See* 29 U.S.C. § 1056(c), (d)(1); *see also Guidry v. Sheet Metal Workers National Pension Fund,* 493 U.S. 365 (1990); *In re Baker*, 114 F. 3d 636 (7th Cir. 1997). Pensions must be distributed strictly according to the terms of each plan. *Blue v. UAL Corp.*, 160 F.3d 383 (7th Cir. 1998); 29 U.S.C. § 1144(a). ERISA states that "each pension shall provide that benefits under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). Exceptions are made for qualified domestic relations order (QDRO) and for judgments (criminal or civil) arising from a violation of ERISA

-36-

obligations. *Blue v. UAL Corp.*, 160 F.3d 383 (7th Cir. 1998). There is no generalized equitable exception for employee malfeasance or for criminal misconduct to ERISA's prohibition on the assignment or alienation of pension benefits. *Guidry*, 493 U.S. at 376.

The Wahlens rely heavily upon *Rousey v. Jacoway*, 544 U.S. 320, 125 S. Ct. 1561, 1564, 161 L. Ed. 2d 563, 568 (2005), for their argument that funds in an IRA rolled over from a pension maintained by an employer are subject to ERISA anti-alienation protections. In *Rousey,* the Supreme Court addressed whether 11 U.S.C. § 522(d)(10)(E)(I)-(iii) allowed debtors to exempt IRAs from the bankruptcy estate. *Id.* In holding they are exempt, the Supreme Court considered the characteristics of the specific plans and contracts that were listed in § 522(d)(10)(E). *Id.*, at 1568-69.

Assuming that the IRA and ESOP are subject to the anti-alienation provisions of ERISA, the court must still decide whether the Mandatory Victim Restitution Act creates the necessary exception. The Seventh Circuit Court of Appeals has not addressed this issue directly. In *United States v. Infelise*, 159 F.3d 300 (7th Cir. 1998), the Seventh Circuit held that a life insurance annuity and Paine Webber account containing funds from a criminal activity were forfeitable under 18 U.S.C. § 1963(m). However, there the court explained that the anti-alienation provision did not apply to individual annuity accounts. *Id.*

The Second Circuit Court of Appeals has held that funds in an IRA may be forfeited. *United States v. Vondette,* 352 F.3d 772, 775 (2nd Cir. 2003), *vacated and remanded on other grounds,* 543 U.S. 1108, 125 S. Ct. 1010, 160 L. Ed. 2d 1035 (vacating in light of *Booker*). *Vondette* explained that policy justifications might exist for protecting IRAs, but protecting IRAs from forfeiture would effectively offer retirement benefits to criminals who were savvy enough to establish such accounts before they were captured. However, Peter

-37-

Wahlen's pension and resultant IRA were not derived from or tainted by any of his fraudulent activities.

More recently, the Second Circuit held that a court may look to ERISA protected assets in determining appropriate fines and restitutions. *United States v. Irving*, 452 F.3d 110 (2nd Cir. 2006). In *Irving*, the defendant asked the Second Circuit to vacate a $200,000 fine levied against him because it violated ERISA's anti-alienation provision. The Second Circuit declined noting that it appeared that Congress accepted the Supreme Court's invitation in *Guidry* by enacting the Mandatory Restitution Act of 1996. The MVRA states that the "United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal or State Law. Notwithstanding any other Federal Law (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property of the person fined . . .."

In addition, on March 23, 2006, the Ninth Circuit Court of Appeals reversed a district court's holding that garnishment of a pension plan was prohibited by ERISA's anti-alienation provision. The Ninth Circuit ruled that with the passage of the MVRA, Congress enacted a statutory exception to ERISA's anti-alienation provision. In so holding, the court reasoned:

> The Supreme Court in *Guidry* noted that an anti-alienation provision was based on "the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties." *Guidry*, 493 U.S. at 376, 110 S. Ct. 680. It also recognized that it was appropriate for Congress to create exceptions to an anti-alienation provision. *Id.* We determine that Congress, by requiring the entry of restitution orders in certain criminal cases (18 U.S.C. § 3663A(a)(1)), by making those restitution orders liens in favor of the United States

Case 2:02-cr-00074-CNC   Filed 09/20/06   Page 38 of 42   Document 158

>> (18 U.S.C. § 3613(c)), and by authorizing the enforcement of those orders against all properties not exempt from the reach of the United States for the payment of taxes (see 18 U.S.C. § 3613(a)), has created a statutory exemption to ERISA's anti-alienation provision.

*United States v. Novak*, 441 F.3d 819, 825 (9th Cir. 2006). Consequently, this court adopts the reasoning of *Novak* and finds that the government may garnish Peter Wahlen's qualified pension plan to enforce this court's criminal restitution order.

Having resolved the legal issues raised by the motions for forfeiture and applications for garnishment, now, the court must decide how to allocate the distributions that Margaret Wahlen received from Peter Wahlen's IRA account at the US Bank. Margaret Wahlen provided an accounting asserting that she and Peter received $135,000 in $3,000 monthly disbursements between August 2001 and April 2005. She claims to have spent $19,906.80 in mortgage payments on the Beaver Dam house from 2001 to 2003, $36,874.98 in property taxes on the Door County house from 2000 to 2002, and $14,026.37 on life insurance premiums from October 2005 to May 2006. Attorney Robert A. Pasch, on behalf of US Bank, has indicated that US Bank made monthly transfers "in the sum of $3,000 each month for the period commencing January 2003 and concluding April of 2005, for a total of 28 such payments resulting in direct distributions in the sum of $84,000."

Margaret Wahlen received a majority of these funds notwithstanding this court's second restraining order dated October 9, 2002, which permitted Peter Wahlen to withdraw up to $3,000 per month from the IRA through the month he reported to prison.[2] After that

_____

[2]The October 9, 2002, restraining order provided in pertinent part:

IT IS THEREFORE ORDERED that defendant Peter Francis Wahlen, his agents and assigns, including Firstar Trust, shall not make, or cause to be made, any withdrawals or transfers in excess of the three thousand dollars

-39-

time, withdrawals were permitted only to pay reasonable attorney's fees and required written permission from the court or the United States Probation Office. The government believes that the US Bank timely received a copy of the second restraining order but that the order was misdirected within the bank. In any event, it appears that the US Bank learned of the second restraining order in April of 2005, when counsel for Margaret Wahlen asked the US Bank to transfer ownership of Peter Wahlen's IRA to Margaret Wahlen. Since that time, Margaret Wahlen has not received any payments.

        The court agrees with the government that the appropriate starting point for the analysis should be the distributions that Margaret received after Peter Wahlen reported to prison in December of 2002. The payments should have ceased in December of 2002 consistent with the terms of the second restraining order. Prior to that date, disbursements of up to $3,000 were allowed. Hence, any distributions received or disbursements made prior to Peter Wahlen's report date will not be considered. By this court's calculation, Margaret

---

($3,000) per month from the IRA held in his name at Firstar Trust (Account No. 600-0647-0700) up to an including the month in which he reports to prison. Following that month, defendant Wahlen, his agents and assigns shall not make, or cause to be made, any further withdrawals or transfers from this account except such additional sums as may be necessary to pay the reasonable attorney's fees of his attorneys, Raymond M. Dall'Osto and Gimbel, Reilly, Guerin & Brown, which may be incurred in connection with this criminal and forfeiture matter and the related civil matters, *American National Bank . Peter F. Wahlen and Margaret G. Wahlen*, Case No. 01-CV-544 (Dodge County Circuit Court), and *In re Marriage of Margaret G. Wahlen and Peter F. Wahlen*, Case No. 02-FA-239 (Dodge County Circuit Court), a pending divorce matter that involves, among other things, property that has become or may soon become the subject of forfeiture motions brought by the government in this matter. However, before Peter Francis Wahlen may withdraw any such funds from the above-referenced account to pay reasonable attorneys' fees, he shall first obtain the written permission of this court or the United States Probation Office, which may review both the legitimacy of his need for the legal services rendered as well as the reasonableness of the fees charged for such services.

Wahlen would receive the current value of the IRA US Bank account plus $42,000 ($84,000 divided by two).

In addition, the court will award a partial credit for the mortgage payments made on the home located at 814 Lakeshore Drive in Beaver Dam. The credit will be awarded in the same percentage of the net equity assigned to the government, which includes the $150,849.60 subject to direct forfeiture and one-half of the balance subject to forfeiture as a substitute asset. It appears that the mortgage payments from the time that Peter Wahlen was charged until the house was sold in March of 2003 were approximately $10,906.80 (3 months at $1,000 plus 8 months at $988.35). Accordingly, the government's share of the proceeds will be reduced by that amount.[3]

Finally, the court will award Margaret Wahlen a credit for premiums paid on any cash-value life insurance policies after Peter Wahlen was charged. Consequently, on or before October 18, 2006, Margaret Wahlen must file an accounting establishing the current cash value of the policy, the date and amount of the premiums paid, and the increase in the cash value of the policy related to the premiums paid. Upon receipt, the government shall promptly submit a final order consistent with this court's rulings.

Now, therefore,

**IT IS ORDERED** that plaintiff's motion for partial summary judgment as to the extent of the government's forfeiture interest in the Beaver Dam and Door County properties as to Peter Francis Wahlen is **granted**. (Doc. # 50)

---

[3]The court rejects Margaret Wahlen's argument that she is entitled to a credit for the property taxes paid on the Beaver Dam and Door County homes. Margaret Wahlen benefitted from the disbursements made from the IRA account as well as the use of the $7,000 home while the forfeiture and garnishment actions remained pending. She has not had to account for the use of the home, and never requested an interlocutory sale to avoid paying future taxes.

**IT IS FURTHER ORDERED** that plaintiff's motion for extension of time to file a reply brief is **granted**.  (Doc. # 60)

**IT IS FURTHER ORDERED** that plaintiff's motion to amend the order of forfeiture to include directly-forfeitable property in Margaret Wahlen's Morgan Stanley account is **granted**. (Doc. # 66)

**IT IS FURTHER ORDERED** that plaintiff's motion to amend the final order of forfeiture to include certain substitute property is **granted**.  (Doc. # 69)

**IT IS FURTHER ORDERED** that plaintiff's motions to amend are **granted**. (Docs. ## 74, 82)

**IT IS FURTHER ORDERED** that Margaret Wahlen shall file a final accounting regarding the cash-value life insurance policies on or before October 18, 2006.

**IT IS FURTHER ORDERED** that the government promptly prepare and submit a proposed final order consistent with the rulings in this case including the court's determination regarding Margaret Wahlen's accounting.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge